UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA IBRAHIM,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:13-cv-00065 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 21) AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF LINDA IBRAHIM AND AGAINST DEFENDANT CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY |

Linda Ibrahim ("Plaintiff") asserts she is entitled to disability insurance benefits under Title II of the Social Security Act. Plaintiff seeks review of the decision of the administrative law judge ("ALJ") who concluded she was not disabled. For the reasons set forth below, Defendant's motion for summary judgment is **DENIED** and the action is **REMANDED** for further proceedings.

**PROCEDURAL HISTORY**

Plaintiff filed her application for supplemental security income on April 27, 2010, alleging disability beginning March 16, 2010, which was denied by the Social Security Administration initially and upon reconsideration. (Doc. 11-3 at 23.) After requesting a hearing, Plaintiff testified before an ALJ on October 11, 2011. (*Id.* at 23, 32.) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on November 2, 2011. (*Id.* at 20-35.) The Appeals Council considered new evidence submitted by Plaintiff, and found no reason to review the decision. (*Id*. at 2-4.) Therefore, the Appeals Council denied Plaintiff's request for review of the

1

decision on November 29, 2012, and the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920 (a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.*  The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.    Relevant Medical Evidence**[1]

In November 2002, Dr. Tushar Modi requested an MRI of Plaintiff's right elbow, in which Plaintiff reported having pain since August 2002. (Doc. 11-8 at 23.) Dr. Wesley Kinzie observed Plaintiff was "tender over the lateral epicondyle area," but was "[o]therwise… neurovascularly intact." (*Id.*) Dr. Kinzie noted Plaintiff had a Cortisone injection, and recommended Plaintiff be given an injection of Lidocaine and Triamcinolone. (*Id.*)

Plaintiff changed her insurance and stopped seeing Dr. Tushar Modi until June 2005. (Doc 11-9 at 22.) Dr. Modi noted Plaintiff had "some sharp shooting pain lasting for a few seconds in the left side in the upper quadrant of [her] abdomen, which last[ed] only for few seconds." (*Id.*) Plaintiff continued to report chest pain in August. (*Id.* at 18.)

On January 11, 2006, Dr. Modi diagnosed Plaintiff with chronic sinusitis and prescribed Vicodin for pain in Plaintiff's right ear, face, and teeth. (Doc. 11-8 at 14-16.) Plaintiff visited the office again the next week, and appeared in "acute distress." (*Id.* at 14.) She reported the symptoms had "improved very slightly" but she was "still in pain." (*Id.*) Plaintiff's pain in her right ear continued through March 2006. (*Id.* at 12.)

On September 12, 2006, Plaintiff was treated by Dr. Tushar Modi. (Doc. 11-8 at 2, 5.) She had no complaints, but requested a checkup and bloodwork. (*Id.*)

---

[1] Plaintiff alleged her disability began March 16, 2010. (Doc. 11-3 at 23.) However, records prior to this date are considered to demonstrate Plaintiff's medical history.

1    Dr. Youhana Jacobs began treating Plaintiff on October 16, 2006. (Doc. 11-8 at 47, 72-74.)
2  Plaintiff reported that she had "elbow tendonitis in the past" in her right arm, but it had "disappeared."
3  (*Id.* at 48.) In addition, Plaintiff stated she had pain in her right wrist and right shoulder. (*Id.*) Plaintiff
4  reported having anxiety, depression and insomnia, and that her anxiety medication was "not helping."
5  (*Id.*) Dr. Jacobs diagnosed Plaintiff with joint pain in her shoulder and forearm; anxiety state, not
6  otherwise specified; depression, not otherwise specified; pure hypercholesterolem; otalgia; and chronic
7  rhinitis. (*Id.* at 47.)

8    In January 2007, Plaintiff continued to report pain in her shoulder and forearms. (*Id.* at 39, 43.)
9  Dr. Jacobs noted Plaintiff continued to have hypercholesterolem, depression, pain, and chronic rhinitis.
10 (*Id.* at 39.) Plaintiff received a six-month prescription for ibuprofen. (*Id.* at 40.)

11    In August 2007, Plaintiff informed Dr. Jacobs that she had "pain on [the] right side of [her]
12 neck worse with neck movement." (Doc. 11-8 at 31.) Plaintiff reported that she went to the emergency
13 room and was given skeleaxin and ibuprofen, and she was "already on hydrocodone." (*Id.*) Dr. Jacobs
14 requested x-rays of Plaintiff's C spine, and advised her to call her insurance company for a referral to a
15 psychiatrist to help with her depression. (*Id.* at 33.)

16    On May 19, 2008, Dr. Jacobs noted Plaintiff suffered from hypercholesterolem and depression,
17 not otherwise specified. (Doc. 11-8 at 27.) Plaintiff continued to take Effexor, which she said helped
18 because she felt depressed but had no suicidal ideations. (*Id.*) Further, Dr. Jacobs noted Plaintiff
19 continued to have joint pain in her shoulders and forearms. (*Id.* at 28.)

20    On May 10, 2010, Dr. Jacobs noted Plaintiff's continued to report pain in her elbow and
21 depression. (Doc. 11-8 at 97.) Dr. Jacobs noted Plaintiff no longer had insurance and did not want to
22 receive x-rays and injections, but Plaintiff's pain in her elbows was "getting worse." (*Id.*) Upon
23 examination, Dr. Jacobs determined Plaintiff had "[t]enderness lateral epicondyle both elbows," but
24 "good range of motion." (*Id.* at 98.) Plaintiff was given an elbow brace, and prescribed vicodin "as
25 needed" for the pain. (*Id.*) Further, Dr. Jacbos refilled Plaintiff's prescription for Effexor to treat her
26 depression. (*Id.*)

27    Dr. Dale Van Kirk performed a consultative orthopedic examination on July 27, 2010. (Doc.
28 11-9 at 19-23.) Plaintiff reported she had carpal tunnel syndrome, and complained of bilateral elbow

pain that started "about eight years ago." (*Id.* at 19.) Plaintiff informed Dr. Van Kirk that she had five injections "which helped only for a short period of time;" chiropractic care that "helped a little bit;" and physical therapy, which "did not help to any great degree." (*Id.*) She reported that the pain increased if she had a heavy grasp, reached up, tried to lift something from ground level, or twisted her wrist "such as turning a doorknob." (*Id.* at 20.) Upon examination, Dr. Van Kirk observed Plaintiff had a "full range of motion of the elbow joints as well as the wrists and digits." (*Id.* at 21.) In addition, Plaintiff's motor strength was 5/5 in her arms and legs. (*Id.* at 22.) Dr. Van Kirk opined Plaintiff was "limited to frequent manipulative activities because of her elbow pain," and "should use her tennis elbow braces on the elbows on each side if she anticipates needing to use the hands for grasp or for heavy activities that would require the use of the upper extremities." (*Id.*) Dr. Van Kirk concluded Plaintiff "should be able to lift and carry frequently 10 pounds and occasionally 20 pounds, limited by pain in the elbows with heavy grasp." (*Id.*) Because Plaintiff demonstrated poor balance, Dr. Van Kirk found she "should not be required to be subjected to unprotected heights." (*Id.* at 21, 23.)

Dr. Ahmed El Sokkary performed a consultative psychiatric evaluation on July 30, 2010. (Doc. 11-9 at 24.) Plaintiff reported that "she was diagnosed with depression shortly after her mother and brother died 3½ years ago and has been on antidepressants since that time." (*Id.*) Dr. Sokkary observed Plaintiff "cried throughout the evaluation," and "appeared to be withdrawn and appeared to be internally preoccupied and guarded." (*Id.* at 24-25.) Dr. Sokkary found Plaintiff had "zero object recall in five minutes," and "had trouble following three-step commands and needed the directions to be repeated often." (*Id.* at 26.) Further, Dr. Sokkary noted Plaintiff "struggled throughout the evaluation and had difficulty with simple and repetitive tasks, which indicate[d] that she would have difficulty doing basic work at th[e] time." (*Id.*) Dr. Sokkary offered the following functional assessment:

> The claimant is not capable of managing her funds. The claimant would have mild difficulties performing simple and repetitive tasks and she would have severe difficulties with detailed and complex tasks. The claimant can accept instructions from supervisors and interact with coworkers and the public. The claimant would have mild to moderate difficulties performing work activities on a consistent basis without special or additional instructions. The claimant can maintain regular attendance in the workplace, but would have mild to moderate difficulties completing a normal workday/workweek without interruptions from a psychiatric condition. The claimant would have mild to moderate difficulties dealing with the usual stress encountered in the workplace.

(*Id.* at 27.) Dr. Sokkary diagnosed Plaintiff with a mood disorder, not otherwise specified, and

cognitive disorder, not otherwise specified, and gave her a GAF score of 60.[2]  (*Id.* at 26.)

On September 22, 2010, Dr. Ying completed a mental residual functional capacity assessment. (Doc. 11-9 at 31-48.)  According to Dr. Ying, Plaintiff had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (*Id.* at 41.)  Dr. Ying believed Plaintiff was markedly limited with the ability to understand, remember, and carry out detailed instructions; moderately limited with the ability to maintain attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, and being punctual with customary tolerances; and not significantly limited in her ability to understand, remember and carry out very short and simple instructions.  (*Id.* at 45-46.)  Dr. Ying indicated Plaintiff had a severe affective disorder, but did not expect it to last 12 months.  (*Id.* at 31.)  In addition, Dr. Ying opined that "[w]ith more aggressive titration of medication, [Plaintiff] should be able to resume simple tasks consistently."  (*Id.* at 43.)

Similarly, on October 8, 2010, Dr. Harvey Bilik opined Plaintiff had a severe cognitive disorder and an affective disorder, but the severe impairments were not expected to last 12 months.  (Doc. 11-9 at 49-50.)  According to Dr. Bilik, Plaintiff had mild restrictions in her activities of daily living and maintaining social functioning.  (*Id.* at 57.)  Further, Dr. Bilik opined Plaintiff had moderate difficulties in maintaining concentrate, persistence, or pace.  (*Id.*)  Dr. Bilik offered a mental residual functional capacity assessment for Plaintiff for the period of March 16, 2010 through March 16, 2011, and opined she was moderately limited in her ability to understand, remember, and carry out detailed instructions; but not significantly limited with very short and simple instructions.  (*Id.* at 60.)  Dr. Bilik concluded that by March 16, 2011, Plaintiff should be "able to understand, remember, and carry out simple instructions over the course of a normal workweek."  (*Id.* at 62.)

On December 16, 2010, Dr. Murillo reviewed the record of Plaintiff's psychiatric impairments and affirmed the mental residual functional capacity of simple, repetitive tasks.  (Doc. 11-9 at 71-72.)

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)."  *Id.* at 34.

1   Dr. Youhana Jacobs completed a questionnaire on February 9, 2011.  (Doc. 11-10 at 2-3.)  Dr.
2  Jacobs opined Plaintiff's pain in her elbows precluded her from performing full-time work at any
3  exertion level.  (*Id.* at 2.)  In addition, Dr. Jacobs believed Plaintiff needed to stretch her right knee and
4  elevate her legs "every ½ hour."  (*Id.*)  Dr. Jacobs noted Plaintiff was unable to lift any weight with her
5  right hand, but could "lift a cup" with her left hand.  (*Id.* at 3.)  Further, Dr. Jacobs opined Plaintiff was
6  unable to handle, push, pull, or grasp; but she could reach for half an hour at one time with her left
7  hand.  (*Id.*)

8   Dr. Priti Modi began treating Plaintiff on August 3, 2011.  (Doc. 11-10 at 28.)  Plaintiff reported
9  she had "chronic neck pain [and] right elbow pain, with stiffness since 2002."  (*Id.*)  After performing a
10 musculoskeletal exam, Dr. Modi determined Plaintiff had a "normal range of motion of all major
11 muscle groups," but reported "pain with range of motion in: neck extension and lateral flexion; right
12 shoulder extension, adduction, internal rotation, and external rotation; right elbow flexion and forearm
13 supination." (*Id.* at 30, emphasis omitted.)  Plaintiff reported pain in the same motions during an
14 examination on August 16, 2011.  (*Id.* at 26.)  Dr. Modi recommended Plaintiff perform passive and
15 active range of motions, progressive weight bearing, and attend physical therapy.  (*Id.* at 31.)

16  On September 6, 2011, Dr. Modi performed another physical examination, and found Plaintiff
17 had a normal range of motion and her muscle strength was "5/5 in all major muscle groups."  (Doc. 11-
18 10 at 22.)  However, Plaintiff reported "pain with range of motion in bilateral elbow flexion, forearm
19 supination, forearm pronation, and right worse than left with superficial elbow swelling and tenderness;
20 right knee extension, internal rotation, and external rotation." (*Id.*)  After the examination, Dr. Modi
21 opined Plaintiff could not work full-time at any exertion level. (*Id.* at 42.) Dr. Modi noted Plaintiff had
22 "severe [and] worsening pain in both elbows" that was "not responding to conservative treatment." (*Id.*)
23 Dr. Modi believed Plaintiff was "unable to work with her hands as [the] more she works with hands,
24 her elbow pain gets worse."  (*Id.*)  Further, Dr. Modi opined Plaintiff was limited to lifting ¼ pound
25 frequently, and she was able to reach, handle, feel, push, pull or grasp for "less than [a] ½ hour."  (*Id.* at
26 43.)  According to Dr. Modi, Plaintiff had "difficulty climbing, squatting, kneeling etc. due to knee pain
27 [and] tenderness."  (*Id.* at 46.)  Finally, Dr. Modi observed Plaintiff had "depression & anxiety & may
28 behave in emotionally unstable manner in stressful situations."  (*Id.*)

On March 23, 2012, after the ALJ issued the decision to deny benefits, Dr. Robert Morgan reviewed approximately 200 pages of Plaintiff's medical records and administering psychological tests including the Beck Depression Inventory II, Brief Symptom Inventory and the Personality Assessment Inventory. (Doc. 11-10 at 49-57.) Dr. Morgan believed Plaintiff appeared "rather drained emotionally," with a "[s]everely depressed mood." (*Id.* at 53-54.) Plaintiff was "able to recall three of three unrelated items upon immediate presentation and recall[ed] one of three items after 5 min." (*Id.* at 54.) Dr. Morgan found Plaintiff's concentration and abstract thinking were impaired because Plaintiff was "unable to engage in serial sevens" and "unable to interpret proverbs." (*Id.*) Dr. Morgan gave Plaintiff a GAF score of $50^3$, and opined she had "marked impairment" in her activities of daily living; maintaining social functioning; and with concentration, persistence, and pace. (*Id.* at 56.)

**B.     Administrative Hearing**

Plaintiff testified at the administrative hearing on October 11, 2011. (Doc. 11-3 at 40.) She reported that she had "tendonitis in both elbows," and wore a wrist brace for her right hand that a doctor gave to her. (*Id.* at 50-51.) Further, Plaintiff testified she suffered from depression because she wanted to work but was unable to do so due to her "aggravating pain." (*Id.* at 51-52.) She reported that she took pain medication, but it made her feel "[d]rowsy, dizzy, tired, [and] sleepy." (*Id.* at 52.)

She stated that she was "sometimes" able to do light household work such as washing dishes, but required help with doing laundry. (Doc. 11-3 at 54.) Plaintiff estimated that she watched television for about two hours each day, and she used a computer to check email and sometimes for online banking. (*Id.* at 55.) She stated that she drove to go shopping once a week, and did not do any outside activities such as attending religious services or walking her dog. (*Id.* at 55-56, 58.) Plaintiff explained she did not like to be around a lot of people because she would "get an anxiety attack." (*Id.* at 58.)

Plaintiff testified that she was able to use her hands for about "[f]ifteen [minutes] to half hour" before she needed to stop and rest for "four or five hours." (Doc. 11-3 at 63.) Plaintiff believed she could lift less than five pounds, and stated she was unable to lift a gallon of milk. (*Id.* at 65-66.) She

---

[3] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *DSM-IV* at 34.

estimated that she was able perform reaching activities such as picking items of a conveyer belt for about thirty minutes at one time, but could do so for "[l]ess than half a day." (*Id.* at 63.) In addition, she reported that she had to stretch her knee every half hour "because it gets spasm[s]." (*Id.* at 64.) Plaintiff described the pain in her knee as sharp, and said her elbow pain felt like "punching nails in [her] elbow." (*Id.* at 65.)

Vocational expert George Meyers ("VE") classified Plaintiff's past relevant work as customer service for retail, *DOT*[4] 299.367-010; office manager, *DOT* 169.176-034; customer complaint clerk, *DOT* 241.367-014; and home attendant, *DOT* 354.377-014. (Doc. 11-3 at 66-67.) The VE explained that transferable skills from these positions included "customer service skills, accounting skills, accounting/bookkeeping, all areas of office management, and also patient care." (*Id.* at 67.)

The ALJ asked the VE to consider "a person of the same age, education, work history, [and] transferrable skills" as Plaintiff. (Doc. 11-3 at 67.) First, the VE considered an individual who "could sit six hours, but stand and/or walk less than even two hours each in a normal work day;" "[n]ever climb, balance, stoop, kneel, crouch, crawl, or work around hazards; and could occasionally lift and/or carry less than 10 pounds." (*Id.*) Further, the individual "would not have sufficient concentration even for simple, routine tasks." (*Id.*) The VE opined that there would not be any jobs available to such a person. (*Id.*)

Next, the VE considered a person who was able to "sit six hours; stand, walk six hours each with normal breaks;" lift and carry 10 pounds frequently and 20 pounds occasionally; and use her "bilateral upper extremities frequently but not constantly for manipulative activities." (Doc. 11-3 at 67-68.) In addition, the hypothetical person "[c]ould not work around unprotected heights or other hazards in the workplace, like moving dangerous machinery." (*Id.* at 68.) The VE opined such a person would be able to "do the customer service for retail and the customer complaint clerk" positions Plaintiff previously held. (*Id.*) In addition, the VE opined other light, unskilled work would be available and identified the following positions: office help, *DOT* 239.567-010; sales attendant for retail, *DOT*

---

[4] *The Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

295.677-010; and storage rental clerk, *DOT* 295.367-026.  (*Id.*)

The VE opined no jobs would be available for an individual who had additional mental limitations including "a moderate limitation in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances," and could not complete a work day or week "without interruptions from psychologically-based symptoms." (Doc. 11-3 at 69-70.)

**C.     The ALJ's Findings**

Pursuant to the five-step process, the ALJ found Plaintiff did not engage in substantial gainful activity after the alleged onset date of March 16, 2010.  (Doc. 11-3 at 25.)  At step two, the ALJ determined Plaintiff's severe impairments included bilateral epicondylitis and depressive order.  (*Id.*) However, Plaintiff's hypercholesterolemia and chronic right knee pain were not severe impairments. (*Id.* at 25-26.)  Further, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing, including Listings 12.00 and 12.04.  (*Id.* at 28.)

After considering "the entire record," the ALJ determined Plaintiff had the residual functional capacity ("RFC") "to perform a wide range [of] light work as defined in 20 CFR 404.1567(b)." (Doc. 11-3 at 28.)  In addition the ALJ found:

> The claimant can stand and walk in combination up to six hours in an eight-hour workday.  She can sit up to six hours in an eight-hour workday.  She can lift and carry up to twenty pounds occasionally and ten pounds frequently.  The claimant can use her bilateral upper extremities frequently, but cannot perform constant manipulative activities.  She is precluded from working around unprotected heights or other workplace hazards, such as dangerous moving machinery.  Finally, the claimant is limited to unskilled work.

(*Id.* at 28.)  With this RFC, the ALJ determined Plaintiff was unable to perform any past relevant work, but would be able to perform work existing in significant numbers in the national economy, such as office helper, sales attendant, and storage rental clerk. (*Id.* at 34-35.)  Consequently, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 35.)

## DISCUSSION AND ANALYSIS

Appealing the Commissioner's decision to deny her application for benefits, Plaintiff argues the ALJ erred in his evaluation of the medical evidence and assessing credibility of Plaintiff's subjective complaints and the statement provided by her husband. (Doc. 15 at 16-26.)

### A.  Evaluation of medical evidence

In this circuit, cases distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight in disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Also, an examining physician's opinion is given more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject a contradicted opinion of a physician with "specific and legitimate" reasons, supported by substantial evidence in the record. *Lester*, 81 F.3d at 830; *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). If there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.*; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

Here, because the opinion of Dr. Van Kirk conflicted with the opinions of Drs. Modi and Jacobs, the ALJ was required to set forth specific and legitimate reasons to give less than controlling weight to the opinions of Plaintiff's treating physicians. Similarly, the ALJ was required to identify specific and legitimate reasons for rejecting the opinion of Dr. Sokkary, an examining physician, in favor of the opinion offered by Dr. Bilik, a non-examining physician.

#### 1.  Opinion of Dr. Jacobs

The ALJ noted, "Dr. Jacobs opined the claimant can never lift any weight with her right hand. She can never reach, handle, push, pull or grasp with her right hand, but can reach up to ½ hour with her left hand and feel up to six hours with both hands." (Doc. 11-3 at 33.) The ALJ gave "little weight" to these opinions, explaining that "Dr. Jacob's (sic) opinion is inconsistent with the claimant's

routine and conservative treatment as well as her activities of daily living showing she is able to use both her right and left upper extremities for manipulative activities." (Doc. 11-3 at 33.)

### a. Conservative treatment

The Ninth Circuit has determined the opinion of a treating physician may be undermined where that physician "prescribe[s] a conservative course of treatment," yet opines a claimant is disabled. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Here, Dr. Jacobs determined Plaintiff had "[t]enderness lateral epicondyle both elbows," and noted Plaintiff's pain in her elbows was "getting worse" despite the pain medications prescribed. (Doc. 11-8 at 97.) Therefore, Dr. Jacobs' appears to acknowledge that the conservative treatment was not addressing Plaintiff's level of pain and her opinion is properly undermined.

### b. Plaintiff's daily activities

The opinion of a treating physician may be given less weight when the physician sets forth restrictions that "appear to be inconsistent with the level of activity that [the claimant] engaged in." *Rollins*, 261 F.3d at 856. Here, the ALJ noted Plaintiff was able to drive a car and use a computer, and found these activities "suggest that her manipulative abilities are not as impaired as initially alleged." (Doc. 11-3 at 33.) However, the ALJ does not explain how the Plaintiff's driving once a week or using a computer to check email is inconsistent with Dr. Jacobs' opinion that she is unable to reach, handle, feel, push, pull or grasp with her right hand, and that the pain in her elbows precluded Plaintiff from working full time at any exertion level. (*See* Doc. 11-10 at 2-3.) Accordingly, Plaintiff's activities do not support the ALJ's decision to not give less weight to the opinion of Dr. Jacobs.

### 2. Opinions of Dr. Modi

The ALJ noted Dr. Modi opined Plaintiff was unable to "lift, carry, push, pull, or grasp with her right hand" and "was precluded from performing any full-time work at any exertion level, including sedentary work." (Doc. 11-3 at 33.) The ALJ observed: "Dr. Modi's opinion is inconsistent with the claimant's routine and conservative treatment history. In addition, the claimant's activities of daily living, including driving a car and using a computer, suggest that her manipulative activities are not as impaired as initially alleged." (*Id.*) Further, the ALJ noted that "Dr. Modi had treated the claimant on only one occasion prior to submitting this statement, which suggests that Dr. Modi did not have a

longitudinal understanding of the claimant's medical history at the time of this evaluation." (*Id.*) For these reasons, the ALJ gave "no weight" to the opinions of Dr. Modi related to Plaintiff's physical limitations. (*Id.*)

### a. Duration of treatment relationship

The ALJ can consider "[t]he length of the treatment relationship and the frequency of examination" in assessing a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2)(i)). Importantly, however, the Regulations "still require[] deference to the treating physician's opinions." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527; SSR 96-2p). Here, the ALJ asserted that Dr. Modi had treated Plaintiff only once prior to offering the additional Questionnaire on September 2011 (Doc. 11-3 at 33.) However, the record demonstrates that Dr. Modi treated Plaintiff and conducted musculoskeletal exams on two prior occasions before assessing Plaintiff's limitations. (*See* 11-10 at 26-46.) Thus, though the ALJ's statement that Dr. Modi treated Plaintiff only one time is contradicted by the record, the Court cannot find that the ALJ erred in considering the short duration of treatment by Dr. Modi and the infrequent contact between Dr. Modi and the plaintiff when considering the weight to give this opinion.

### b. Conservative treatment

As discussed above, the prescribed treatment may be a specific, legitimate reason for rejecting the opinions of a treating physician such as Dr. Modi. *See Rollins*, 261 F.3d at 856. Importantly, however, Dr. Modi observed Plaintiff had been "unable to get pain relief," and she was "not responding to conservative treatment." (Doc. 11-10 at 42, 45.) Dr. Modi noted cortisone shots, physical therapy and taking ibuprofen "all have failed so far."[5] (*Id.* at 44.) Though Dr. Modi prescribed narcotic pain medications which "help" (*Id.* at 42), the side effects were problematic, though he continued Plaintiff on this course of medication. *Id.* at 22, 42, 44. Dr. Modi determined he may refer Plaintiff to a pain management specialist "if needed." *Id.* at 44. Dr. Modi failed to explain why, given his opinion the pain was not well-managed, he did not refer Plaintiff to pain management.

---

[5] The record seems to indicate that Dr. Modi was told these treatments failed by Plaintiff but he did not attempt them during his limited treatment of her.

Therefore, Dr. Modi appears to acknowledge that the conservative treatment was not addressing Plaintiff's level of pain but, rather than attempting other methods which he felt could be effective, Dr. Modi failed to do so and, instead, determined a significant level of disability. Thus, opinion is properly undermined.

### c. Plaintiff's daily activities

The ALJ purported to give "no weight" to the opinion of Dr. Modi in part due to Plaintiff's daily activities. However, as noted above as to Dr. Jacobs' opinion, the ALJ also does not explain how the Plaintiff's activities is inconsistent with Dr. Modi's opinion that she is unable to reach, handle, feel, push, pull or grasp for more than half an hour at one time. (*See* Doc. 11-10 at 43.) Similarly, the ALJ did not explain how these limited activities are inconsistent with Dr. Modi's opinion that Plaintiff was limited to lifting ¼ pound frequently. (*See id.*) Accordingly, Plaintiff's activities do not support the ALJ's decision to give no weight to the opinion of Dr. Modi.[6]

### 3. Opinion of Dr. Sokkary

Dr. Sokkary performed a psychiatric evaluation of Plaintiff, and offered a functional capacity assessment. The ALJ observed: "Dr. Sokkary opined the claimant would have difficulty doing basic work at this time. Dr. Sokkary went on to opine that the claimant would have only mild difficulties performing simple and repetitive tasks, which is internally inconsistent with his previous statement." (Doc. 11-3 at 32.) Accordingly, the ALJ gave the opinion "no weight." In addition, the ALJ noted Dr. Sokkary diagnosed Plaintiff with a cognitive disorder, but gave it "no weight" "because it is inconsistent with the medical record as a whole showing no diagnosis of cognitive disorder." (*Id.*)

Significantly, the inconsistencies the ALJ purports to identify do not support the decision to completely reject Dr. Sokkary's opinion. In conducting the examination, Dr. Sokkary observed that Plaintiff "struggled throughout the evaluation and had difficulty with simple and repetitive tasks," which Dr. Sokkary believed "indicate[d] that she would have difficulty doing basic work at th[e] time."

---

[6] Notably, even if the ALJ explained the finding that Dr. Modi's opinion was inconsistent with Plaintiff's level of activity, that finding "means only that the opinion is not entitled to 'controlling weight,' *not that the opinion should be rejected*." SSR 96-2p, 1996 SSR LEXIS 9 at *9-10. Rulings are issued by the Commissioner to clarify regulations and policies. Though they do not have the force of law, the Ninth Circuit gives the rulings deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

(Doc. 11-9 at 26.) Dr. Sokkary did not note the level of difficulty Plaintiff had with the simple and repetitive tasks. The difficulty exhibited could have ranged from severe to mild, as Dr. Sokkary determined in the functional capacity assessment. Moreover, the ALJ's assertion that no other physician diagnosed Plaintiff with a cognitive disorder is contradicted by the record because Dr. Bilik also opined Plaintiff that had a cognitive disorder. (Doc. 11-9 at 50.) Consequently, the ALJ erred in giving "no weight" to the opinion of Dr. Sokkary.

**B.      Remand is appropriate in this action**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the District Court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed when no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Applying the *Smolen* factors to this case, the ALJ failed to set forth legally sufficient reasons to properly reject the opinion of Plaintiff's treating physician, Drs. Jacobs and Modi, related to Plaintiff's physical impairments. In addition, the ALJ erred in rejecting the opinion of Dr. Sokkary related to her mental impairments. These opinions are intertwined with the RFC determination by the ALJ, and the testimony of the vocational expert regarding Plaintiff's ability to perform work in the national economy. Consequently, the matter should be remanded for the ALJ to re-evaluate the medical opinions, because it is not clear from the record that the ALJ would be required to find Plaintiff disabled if the opinions of the treating physician were to be credited.

///

**CONCLUSION AND ORDER**

For all these reasons, the ALJ erred in the evaluation of the medical evidence and in giving "no weight" to the opinion of Dr. Sokkary.  Because the ALJ failed to apply the correct legal standards, the decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510.  Therefore, the Court does not address the remaining issues raised by Plaintiff on appeal, because remand is appropriate for the ALJ to reconsider the medical evidence.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's motion for summary judgment (Doc. 21) is **DENIED**;
2. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and
3. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Linda Ibrahim and against Defendant Carolyn W. Colvin, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:  **March 25, 2014**            /s/ Jennifer L. Thurston
                              UNITED STATES MAGISTRATE JUDGE